(17 Misc. Rep. 71.)

HINCK et al. v. WILMERDING et al.

(City Court of New York, General Term.    May 23, 1896.)

FRAUD—EVIDENCE.
    Where there was no evidence, in replevin for goods which one A., by false representations as to his solvency, induced plaintiff to sell to him, and which he sold to a third person, from whom defendant purchased them, that defendant had any knowledge of A.'s fraud, a verdict for plaintiff cannot be sustained.

Appeal from trial term.

Action by Henry J. Hinck and others against John C. Wilmerding and others.    There was a judgment in favor of plaintiffs, and defendants appeal.    Reversed.

Argued before CONLAN and SCHUCHMAN, JJ.

Goldsmith & Doherty, for appellants.
Gruber & Bonynge, for respondents.

CONLAN, J.  Appeal from a judgment in favor of the plaintiffs, and from an order denying a motion for a new trial.  This is an action of replevin, and was commenced originally against the firm of Wilmerding, Morris & Mitchell; and thereafter Morris Garfinckle, on his own motion, was allowed to come in and defend.  The defendants Wilmerding, Morris & Mitchell did not appear in the action. The subject of the action was nine pieces of worsteds, of the alleged value of $650.  The plaintiffs sold the worsteds to one Alexander, who at the time of the purchase made certain representations to them as to his solvency; he claiming to them that he was worth $18,000 to $20,000, and at the end of the month of April, 1894, he would inherit about $10,000 from his mother, making him worth about $30,000.  These representations were made by Alexander to the plaintiff Hinck, who says he did not investigate them at the time, but that Alexander failed in business on April 24, 1894, and then Hinck began an investigation.  He says he found some of the goods at Wilmerding, Morris & Mitchell's auction rooms, and learned from that firm that they were received from Garfinckle.  Plaintiff called upon Garfinckle, without disclosing himself, or the object of his visit, and was told by Garfinckle that he had no such goods as samples shown him by the plaintiff; that he was not doing business that day (Saturday), but if he would call after 6 o'clock he would show him what he had.  It further appears that he called, and did not find the goods in question, and then, without any further dealing with Garfinckle, commenced this action against the firm of auctioneers to replevin the goods, and did not join Garfinckle as a defendant, although he was made aware that the latter had sent the goods to the auction rooms, claiming the ownership and to be entitled to the proceeds.  The plaintiffs called their vendee, Alexander, to the stand, who, strange to say, proved for them the falsity of his representations; and he further testified that he did not sell the worsteds to Garfinckle, but that he sold them to different parties:  At folio 52 he says, "I had most of my dealings with Bezozi, a customer of mine who had been in the habit of buying goods from me for quite a while," but he was unable to say if Garfinckle ever bought any goods of Bezozi.  It is admitted that no demand was made upon Garfinckle for the goods, the contention of the plaintiffs being that as the goods were not in his possession, as he denied that the goods represented by the samples shown were his goods, and as the plaintiffs had assumed that he was not an innocent holder, therefore, a demand was not necessary.  The plaintiff Hinck also says, "I knew when I commenced suit against Wilmerding, Morris & Mitchell that Garfinckle had placed the goods in their store for sale."  There was no evidence, down to the close of the plaintiffs' case, in any way connecting Garfinckle with the transaction originating with Alexander, except what occurred at the interview between him and Hinck.  At the close of the plaintiffs' case a motion was made for a nonsuit on the grounds—First, that a cause of action was not proven; second, that

no demand had been made upon Garfinckle; third, that there was no evidence connecting Garfinckle with any fraudulent transaction. And the same was denied, and the defendants excepted.

Garfinckle testified that he bought the goods of Bezozi; that he had known him for six or seven years, and had bought of him before, and had many transactions with him; that he bought goods of him on the 18th day of April, and paid him by check; prices of the goods range from $1.50 to $2 per yard, and he gave him a check on the East Side Bank for $910, and afterwards, on the 24th day of April, he gave him a check for $1,200 to pay what he owed him, including a previous bill. And that check, bearing Bezozi's indorsement, was put in evidence by the defendants. He says he never bought any goods of Alexander, and did not know that the goods in question were purchased of Alexander. The bill of goods purchased of Bezozi on April 18, 1894, was put in evidence without objection, and it is for 563 yards, amounting to $760.05, and marked "Paid." He also says that when Hinck called on him he took out some samples, and said, "Have you that and that?" and he replied, "I have nothing like those in the house, because I sold them at auction," and also that he had 60 or 70 lots at Wilmerding, Morris & Mitchell's, and that they were all sent on the same day, and that he asked the auctioneer to sell them for $2 per yard, but that if he got $1 he would be satisfied. They were sold before Hinck called. He further explains the average of $1.35 per yard paid Bezozi, saying, "There were some goods worth as low as $1.10, and some 75 cents per yard;" and he could not tell how many were worth $2, and how many 75 cents. John J. Morris, of the auction firm, also testified that they had dealt with Garfinckle for five years, and that his goods came to the auction in the ordinary way.

We have referred somewhat at length to the evidence adduced on the trial, with a view of ascertaining, if it were possible, just upon what the jury found their verdict for the plaintiffs, to the end that, if such a verdict were warranted by the evidence, it would not be within our province to disturb it, except for errors and rulings of the trial judge; and we are inclined to the opinion that all the evidence in the case, of which a fair sample is here given, does not sustain the finding of the verdict in favor of the plaintiffs. There is no evidence imputing knowledge of the fraudulent practice and representation of Alexander to the defendants. On the contrary, they both swore they did not know either in the transactions and dealings. There is no evidence connecting Bezozi with the fraud of Alexander. And in the former dealings with the defendants we do not find grounds for casting any suspicion of unfair dealing upon Garfinckle. Indeed, it appears to us that there has been a failure of proof to show that the appellant was aware of the fraud practiced by Alexander, or that he was other than an innocent holder for value, and therefore nothing need be left to conjecture. We may not presume fraud, but, rather, should it be proven, or facts established which impute to the party to be charged knowledge of the fraud practiced or intended, so that he may be put upon his inquiry. Nothing of this kind is disclosed in the present case. While we are not prepared to say

that the case was entirely free from error in the refusal of the court to dismiss the complaint at the close of the plaintiffs' case, or at the close of all the testimony, it is altogether inconceivable that a verdict for the plaintiffs should have been rendered after the charge to the jury on the whole evidence in the case, and upon the request of the defendants' attorney, all of which were charged without exception.

For the reasons stated, we are impelled to the conclusion that the verdict ought not to stand; and the judgment is therefore reversed, and a new trial granted, with costs to the appellants to abide the event.